**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HRF TRADE INC.,<br>(a Delaware corporation, at 16192 Coastal Highway, Lewes, DE 19958; office at 1025 Connecticut Ave. Ste 615, Washington, D.C., 20036)<br><br>Plaintiff<br><br>v.<br><br>AKIMAT OF ATYRAU<br>(77a Aiteke-be Street, Atyrau, Kazakhstan)<br><br>and DOES from 1 to 10<br><br>Defendants | CIVIL ACTION No. 17cv1019<br><br>**COMPLAINT**<br><br>**1. CONFISCATION OF ASSETS WITHOUT JUST COMPENSATION;**<br>**2. VIOLATION OF RIGHTS UNDER TREATY;**<br>**3. UNJUST ENRICHMENT;**<br>**4. DECLARATORY RELIEF** |

## I. NATURE OF ACTION

This is an action brought based on the claims arising from the confiscation of American investments overseas without just compensation on fair market terms and related causes of action. Subject to the findings on the exact status of the Defendant, Akimat of Atyrau City in Kazakhstan, these claims are made pursuant to 28 U.S.C. §1605 ('General exceptions from jurisdictional immunity of a foreign state') and other applicable law, including the 1992 Treaty of USA with Kazakhstan described below. The present action asserts the claim for the required just compensation upon the confiscation overseas of the assets invested by American business in Kazakhstan, in violation of the international law, other claims for damages and declaratory relief.

## II. PARTIES.

1. Plaintiff HRF TRADE INC., aka HRF ENTERPRISES INC., aka HUMAN REDEPMPTION FOUNDATION, is a corporation initially registered on December 31, 2009 in the State of Delaware, State Docket 4772141, under the name Human Redemption Foundation ("HRF"). It was created and financed by Maxioil Ltd. ("Maxioil"), a corporation, which had been incorporated in the State of Massachusetts on April 26, 2006. Maxioil was dissolved in June of 2012; a part of its assets went to HRF. On another side, HRF has also been financed through EnergyFund Inc. (EnergyFund), a District of Columbia corporation, registered in this jurisdiction on August 25, 2009, active now. In December of 2012, HRF was transferred from Delaware to the State of Florida, with the abbreviation of the first three letters and adding the word "Enterprises", resulting in the updated corporate name HRF Enterprises Inc. The Florida-registered corporation, HRF, was active in Florida through 2016. Subsequently, upon completion of a certain project in that State, the HRF entity was transferred back to Delaware and re-registered under its present name, HRF Trade Inc., State docket #6416573, with the same registered address as of 2009: 16192 Coastal Highway, Lewes, Delaware, 19958, as initially registered. HRF has an office in this District, the same as of EnergyFund, at 1025 Connecticut, Ste 615, Washington, D.C., 20036. Since 2006, HRF's predecessor in rights Maxioil and then HRF have been supporting projects overseas, including in Kazakhstan. Even though HRF is initially the sole Plaintiff at this stage, there are other American corporations that have interest in these claims and this action, which may be added as Plaintiffs in due course in this case.

2. Defendant AKIMAT OF ATYRAU (hereinafter also the "AKIMAT") is a self-governing municipal agency of the City of Atyrau (formerly the City of Guriev) in the

Republic of Kazakhstan, at the address: 77a Aiteke-be Street, Atyrau, 060011, Kazakhstan. Akimat was formed in 1992, upon the dissolution of the former USSR (Union of Soviet Socialist Republics), when Kazakhstan, also named Republic of Kazakhstan, became an independent country. At that time all municipal entities for cities in Kazakhstan, inherited from the USSR, were reformed, renamed and reinstituted and/or re-incorporated as new self-governing entities for the cities in the new country. Atyrau is the administrative center of the Atyrau region in Kazakhstan. It is located at the mouth of the Ural river on the Caspian Sea, which serves as a border line between Europe and Asia, about 1,700 miles to the west of Almaty (the largest city in Kazakhstan and a former capital) and 218 miles east of the city of Astrakhan in Russia. Atyrau, a city of about 270,000 inhabitants with suburbs and a port on the Caspian Sea (an internal sea without access to the oceans), has a maritime access on the Caspian Sea, which connects it, apart from other Kazakh ports, to the Caspian ports of Russia, Iran and of Azerbaijan.

3. As a self-governing body, Akimat may be treated as not satisfying the applicable tests for claiming a sovereign immunity, within the meaning of the U.S. Foreign Sovereign Immunity Act of 1970, Title 28, §§1330, 1332, 1391(f), 1441(d), and §§1602–1611. However, as a municipal entity, Akimat has acted under the color of right pursuant to the government powers in Kazakhstan and may possibly seek to shield itself in this action by the claim of sovereignty.

4. Defendants DOES from 1 to 10 are the parties associates with Akimat, whose identity is unknown to HRF at this time, and who are proper defendants in this action which may be added at a later stage. Once the identities of those parties is established, HRF anticipates joining those as additional defendants in this action.

//

## II. JURISDICTION AND VENUE.

5. Jurisdiction is proper under the diversity of citizenship test, where HRF is a Delaware corporation and Akimat is an entity under the laws of Kazakhstan. The diversity of citizenship applies, where a claim exceeds the statutory minimum of $75,000, pursuant to 28 U.S.C. §1332. As mentioned above, HRF's predecessor in rights was Maxioil, a Massachusetts corporation, registered in 2006. As also mentioned, HRF, registered in Delaware first in 2009, was then transferred in 2012 from Delaware to Florida and, after about 6 years, returned back to Delaware. Furthermore, a District of Columbia corporation, EnergyFund Inc., registered in this District since 2009, also participated in investments in Kazakhstan under the projects described below. None of these corporate structuring steps or events, involving the jurisdictions of Delaware, Massachusetts, Florida and the District of Columbia in the U.S., destroys the principle of a diversity of citizenship in this matter, where the defendant is an entity in Kazakhstan.

6. The issue if Akimat may be treated as an "organ of a foreign state" is noted here. Out of extra precaution, HRF assumes that Akimat claims the authority of the sovereign country for its certain actions and will seek being classified under FSIA's §1603(b) as an agency or instrumentality of a foreign state. The disclaimer is made that it is Akimat that will have to prove the applicability to it of a sovereignty immunity as an agency or instrumentality of a foreign State. Thereby, HRF will be of the position that Akimat's status as a self-governing municipal body does not rise to the level of the sovereign immunity applicability under §1603(b).

7. In the event Akimat proves before this Court that it qualifies to be treated as an "agency" or an "instrumentality" of Kazakhstan, then this Court has jurisdiction over the subject matter of this action and over that Defendant also pursuant to the Foreign

Sovereign Immunity Act ("FSIA"), namely under 28 U.S.C. §1605 ('General exceptions to jurisdictional immunity of a foreign state'). The FSIA's statutory exceptions apply within the meaning of the "commercial exception" and the "expropriation without compensation", and because of the commercial effects in the U.S. of Akimat's action described hereinafter. Jurisdiction is proper inasmuch as FSIA's §1605 invokes the federal law question within the meaning of 28 U.S.C. §1331.

8. Since 1992, Kazakhstan has undertaken the obligations under the Treaty between the USA and Kazakhstan Concerning the Encouragement and Reciprocal Protection of Investment. Kazakhstan's obligations under that Treaty have been disregarded by Akimat in this particular matter, within the meaning of 28 U.S.C. §1605. Pursuant to Article XII of said Treaty, the "…Treaty shall apply to the political subdivisions". The obligations of a sovereign country under that Treaty apply to the Akimat, which has violated international law.

9. Venue is proper because, *inter alia*, any case against an instrumentality of a foreign State may be brought in the District of Columbia, pursuant to 28 U.S.C. §1391(f)(4). Otherwise, aliens may be sued in any District pursuant to 28 U.S.C. §1391 and other law. Furthermore, HRF has an office in Washington, D.C.

## III. UNDERLYING FACTS.

A. Background for American Investments in Kazakhstan.

10. As a preliminary consideration, American investments, shown in this instant case would have not been made overseas other than owing to the protection accorded to private investors pursuant to the 1992 Treaty of the U.S. with Kazakhstan, described below.

11. After gaining its independence in 1992, Kazakhstan embarked on attracting western investments into its economy, encouraging foreign investments, including from North America, making this a priority in its foreign policy and economic policy.

12. As mentioned above, among its first steps, in May of 1992 Kazakhstan entered into an agreement with the U.S., entitled the Treaty between the USA and Kazakhstan Concerning the Encouragement and Reciprocal Protection of Investment (hereinafter also the "Treaty"). That Treaty entered into force in January of 1994.

13. Shortly after signing that Treaty, on July 23, 1992, Kazakhstan also signed the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, with the Secretariat in Washington D.C. That Convention entered into force for Kazakhstan on October 21, 2000.

14. While having a limited investment capital base of its own, Kazakhstan, including municipal entities and local private businesses were seeking to attract foreign capital, foremost from the USA.

15. As a part of its policy of encouraging investments from North America and the western investments in general, Kazakhstan adopted various laws, acts and statutes, purportedly to protect the interests of foreign investors. For example, that included the Act on the Use of Subsoil Resources, adopted in January of 1996, statute No. 2828. That Act's Article 3.3 proclaims that generally "Foreigners and foreign corporations… enjoy the rights and bear responsibilities with regard to use of mineral resources on the same basis as citizens and corporations registered in Kazakhstan…"

16. The Embassy of Kazakhstan in Washington, D.C. has promoted on its website investments in the Atyrau region. As the Embassy's website states: the "Atyrau region is the oldest oil and gas-producing region of Kazakhstan. Currently over 250 oil and

gas fields are discovered in Kazakhstan. 62 of them are located in the Atyrau region. One of the largest oil fields in the region is Tengiz, which has reserves from 750 million to 1.125 billion tons of oil." See http://www.kazakhembus.com/content/doing-business-atyrau-region.

17. The Embassy of Kazakhstan in Washington, D.C., among other promotional steps, posted an Investors' Guide, sponsored by the Kazakh Ministry of Investment and Development. See http://www.kazakhembus.com/content/investors-guide. That Investors' Guide, sponsored by the Embassy and by the central bodies of government in Kazakhstan specifically presents (on p. 77) the Akimat of Atyrau as the proper counterpart for doing business in Kazakhstan in that Northwest region of the country.

18. Generally, Kazakhstan has been very aggressive in its pursuit of investments from the USA. For example, in December of 2016, the 4th Kazakhstan - U.S. Convention was held in Washington, D.C., with the most active backing of Kazakh authorities.

B. The Investment into First Plot of Land and Improvements in Atyrau.

19. The City of Atyrau, on the Caspian Sea, is a center of a region where oil and gas deposits have been explored, discovered, and became productive. Generally, Chevron and dozens of other American oil concerns have been operating in Kazakhstan, undertaking exploration and production of oil and gas. The Atyrau region, where there exists one refinery is considered to be one of the most promising areas for investments.

20. When a local entity, financed by American investors, including HRF, was to acquire the land in the Atyrau region, there is normally an anticipation of a double purpose. The land could be acquired for ultimate urban development along with gardening,

but the land could also be eventually used for an oil and gas exploration, including but not limited to, drilling exploratory wells.

21. In February of 2005, Kazenercom LLC (Kazen), a company registered in Kazakhstan, acquired a plot of land of 2322 sq.ms., or 0.2322 hectares, equal to 0.5738 acre, land plot ID 04-055-017-446. That plot is located in the central part of Atyrau, approximately 1.5 mile from the Ural river. Upon acquisition, Kazen started to seek American investments in order to undertake improvements and return or refinance the loans originally obtained from local banks. At that time, the financing came from Maxioil, whose rights, as stated above, were subsequently taken over by HRF.

22. In particular, Kazen, using American investments, disassembled and removed the gas storing facility and the equipment for compressing and condensing natural gas. Kazen prepared a general plan of development for that plot, including the construction of a five-story building, which was commissioned with an architectural firm Almatygyprogor.

23. As of the time the land was cleared and levelled, ready for development, its estimated value was 30 million tenges, or approximately $200,000 at that time, based on the value of approximately $10 per square foot. In the course of the improvements, Kazen, using American investments, paid more than 9 million tenges or about $60,000. However, once the plot of land was ready for development and a number of permits were obtained, its value was increased exponentially, well beyond the investments.

24. Regardless of Kazen's rights and in disregard that Kazen was financed from the U.S., on December 8, 2011, Akymat issued a decision to use a plot of land of 0.091 at the address 43 Baymukhanova Street in Atyrau, for construction purposes. That plot of land had an overlapping with the plot of land owned by Kazen, but was smaller.

25. In March of 2012, Akymat started a construction project on the land held by Kazen, despite the violation of the law and despite trespassing on the land held by Kazen. Despite a barrage of complaints from Kazen, Akymat residential constructed a 6-story building on that land, completely ignoring the rights of Kazen and its American investors who infused capital into that development. Among other things, the construction by Akymat on Kazen's plot of land was illegal, because no court had confirmed the decision of Akymat to use that land, held by Kazen.

26. In light of the basics of the law, all improvements on the land owned by Kazen, even without its permission or adjudication by the court of the land ownership, were to be counted towards the value of its property. In accordance with that principle, the value of that plot was increased by at least $1.8 million. As pointed out below, HRF is not seeking that surplus caused by the construction by Akimat as damages in this action, but the fact is noted for a context of the events.

27. After the construction project was nearly completed by Akimat, in 2013 Akimat brought a suit in the local court in the City of Atyrau and obtained a confirmation of the confiscation of the land. Akimat then put the apartments in that building for sale and sold those apartments one by one.

28. In 2013, Akimat made an ultimatum to Kazen to get a refund of the minimal 499,810 tenges, at which the land had been acquired by Kazen back in 2005 and gave the right to acquire a far less attractive plot of land in the suburbs of the city, instead of the highly desirable realty in the center of the city, where the confiscated plot was situated. In the real terms, those terms of the taking or of the confiscation had nothing to do with the fair and true market value of the property and constituted an arbitrary confiscation without just compensation, and not for public purposes.

C. The Investment into Second Plot of Land and Improvements in Atyrau

29. A similar scenario occurred with another plot of land, acquired and developed in Atyrau through HRF and other American businesses related to it. That other plot was many times larger in size.

30. The investments undertaken through Maxioil, its successor HRF and otherwise, resulted in the acquisition through Kazen in 2007 of the substantial plot of land of 20.0 hectares or 49.2 acres of land in the suburb of Atyrau. That plot of land has a local realty designation as No. 04-066-046-1158.

31. That plot of land, of 49.2 acres, had multiple possibilities for use, from the very beginning. As mentioned above, in the most favorable scenario, the seismic works could confirm the possibility that that land could be used for oil and gas exploration and ultimately production. In the event the land would show no commercial deposits of oil and gas, as a fall back scenario the plot was subject to development, including the gardening projects.

32. On November of 2009, the official appraisal entity undertook an appraisal of the said plot of 49.2 acres. According to its appraisal, the land's worth was 169 million tenges, or approximately $1,100,000 at the time. By way of a clarification, the title to the land was not fully transferred to the private owners, but was transferred under the guise of an unrestricted lease with use rights, which is interpreted as a guarantee for at least for 99 years. Even as of now, Kazakhstan's laws do not allow purchase of land by foreigners; an acquisition through funding a local entity is a standard legal avenue for such investment projects.

33. Since the acquisition in 2009, American investors, through Kazen, undertook various improvements on the land and prepared a prospective plan of development. That plan of development was worth about $70,000, on the market terms.

34. The land that was subject to development and other commercial use was bulldozed to flatten the surface. Other improvements were made. Even though the development project was never brought to fruition, there was a partial temporary development, where Kazen oversaw and managed the gardening of temporary lessors of the parcels of land.

35. The local entity, Kazen, applied and obtained a preliminary approval at Akymat of the liberalization plan for the use of that land.

36. That development plan previewing the construction of several condo buildings that was approved by Akimat on a preliminary basis, encouraging further outlays and investments, was ultimately never certified by Akimat. As it appears, it was the intention of Akymat at all times, first to attract investments and then to expunge foreign investors one way or another.

37. On information and belief, Akimat intentionally caused delays with certification of the development project, instead anticipating to confiscate the land.

38. Without asking HRF, in or about 2014-2016, Akimat caused improvements on that plot of land. That included conducting electricity transmission line over that land, with the value of over $120,000. Furthermore, in the same period of time, other infrastructure means were created, with an estimate of works for $50,000. Thereby it was never clear who issued the permits and ordered those works, even though, on information and belief, Akimat must have acted it for purposes of at least issuing permits for such works.

39. The local business, Kazen, financed from the U.S., took the position that such improvements, even though not financed by it or its American investors, created the value, belonged to the owner of the rights to that land, Kazen. That position was supported by the law in Kazakhstan.

D. Akimat Issuing Ordinance of Confiscation of Second Plot of Land without Just or Any Compensation.

40. On February 17, 2017, Akimat unexpectedly issued an order of confiscation of that land, entitled the "Ordinance on Commencement of Compulsory Confiscation of Realty from Kazenercom LLC for State Use". See Exhibit A to the Complaint.

41. According to the Ordinance, Akimat justified its actions by Article 242 of the Civil Code of Republic of Kazakhstan, being guided by the Articles 16, 85, 75 of the Land Code of the Republic of Kazakhstan of June 20, 2003 No. 442-II, the Article 57 of the Act of the Republic of Kazakhstan 'On Local State Governance and Self-Governance in Republic of Kazakhstan', and the Article 63 of the Act of the Republic of Kazakhstan "On State Property".

42. Akimat's reference to those governmental laws and acts of Kazakhstan was for pro-forma purposes and had little or nothing to do with the real purposes of the confiscation.

43. In the said Ordinance, Akimat also disclosed that the confiscation was made in accordance with the Minutes of the conclusions of the commission upon consideration of physical and legal persons on the allocation of land plots, of January 10, 2017, entitled the Ordinance No. 1.

44. The true driving force for adopting the said Ordinance was, on information and belief, actually a conglomerate of the local private interests, that envisioned to use that

land for private purposes and for getting an extraordinary profit. Upon a confiscation, those local businesses did not need to buy out that land on the true and fair market terms, subject to the consent of Kazen and its American investors, including HRF. Those local private interests had some connection with Akymat's executives and officials.

45. On its end, Kazen, along with HRF and other American investors, was never invited to the meeting on January 10, 2017, and learnt of it after the fact. Kazen and HRF were precluded from making known their claims to the rights and their view on the use of that land.

46. The Ordinance of Akimat identified the land, held in the name of Kazen, without naming its American investors, as the plot situated at the address: City of Atyrau, District Atyrau Village, with the area of 20.0 hectares or 49.2 acres, under the designation of the plot No. 04-066-046-1158.

47. Furthermore, the Ordinance said that it previewed the purpose of creating engineering communications for the residential area Zarosly in Atyrau area. However, that residential area was being developed by private developers in Kazakhstan. Their plan was to eliminate the asset of Kazen and its American investors, including HRF, for purposes of private gain in unreasonably excessive amounts. That extraordinary profit was possible due to the fact that the local businesses, benefitting from confiscation, obtained the land on symbolic prices, without relationship to the fair market value of the same.

48. The Ordinance did not provide any compensation for the confiscated realty asset at all. The only provision that may have hinted at any such provision was that the interested parties had to direct their "negotiations" or inquiries at the address as follows: "The owners of the Land for conducting negotiations shall be directed at the following

address: 77-A Aiteke be Street, Building of the City Akimat, 3rd Floor, Suite 310, City of Atyrau".

49. In the real life, the term "negotiations" used in Akimat's Ordinance had no meaning, because those did not provide for any mechanism for a just compensation or any legal way for seeking or enforcing a just compensation for the confiscated land, on the fair market terms.

50. Since the publication of the Ordinance after February 17, 2017, all attempts by Kazen acting on behalf of HRF to obtain any commitment for a just and fair compensation for the confiscation of the assets have been ineffective. The intermediaries for Kazen and HRF who contacted Akimant's representatives only heard vague responses. See Exhibit A to the Complaint.

**COUNT I. CONFISCATION OF ASSETS WITHOUT JUST COMPENSATION.**

51. Plaintiff incorporates by reference the allegations in Paragraphs 1-50, as if pled herewith again with full force and effect.

52. As mentioned above, in 2005 Akimat sold to Kazen a plot of land with a gas compression station, representing the land of 0.2322 hectares, equal to 0.5738 acres, plot ID 04-055-017-446. Kazen took financing from Maxioil, the title to which then passed to HRF, in order to undertake improvements, preparing to build a 5-story building.

53. In 2012, all of a sudden, despite Kazen's vigorous objections, Akimat started a construction of a 6-story building. In 2013, Akimat obtained in the local court in Atyrau a court decision on the confiscation of that land, with a refund in nominal terms of the initial acquisition back in 2005, and rights to acquire another plot.

54. That confiscation and partial compensation was not on market terms and represented damages to Kazen and resulted in confiscation of American investments.

55. A similar sequence of events took place with the second plot of land, as described above. Once Kazen, financed from the U.S., undertook very substantial investments, Akimat then moved in and took the land and all the improvements, this time without any compensation whatsoever.

56. On or about February 17, 2017, Akimat issued the Ordinance confiscating the land, held in the name of Kazen, without naming its American investors, namely the plot situated at the address: City of Atyrau, District Atyrau Village, with the area of 20.0 hectares or 49.2 acres, under the designation of the plot ID 04-066-046-1158.

57. The Ordinance of February 17, 2017 did not preview any just compensation for Akimat's taking of the private property, and was, as such, in violation of international law inasmuch as the American investments were made into that land.

58. On either of the two occasions, the confiscation by Akimat was not for true public purposes or justified. As mentioned above, the true driving force for adopting the said Ordinance was, on information and belief, actually a conglomerate of the local private interests, that envisioned to use that land for private purposes. The local businesses aimed at getting from such a confiscation an extraordinary profit, when they did not need to buy out that land on the true market terms, and did not need a consent of Kazen and its American investors, including HRF. Furthermore, those local private interests had some connection with Akymat's executives and officials.

59. Upon the most advanced computation methods as to value the property rights and the assets that were confiscating by Akimat, ultimately representing the losses for HRF, the amount of damages is $1,378,410.

60. Plaintiff is entitled to the compensation for the arbitrary confiscation of the assets by Akimat, created due to American investments through HRF and otherwise, without just compensation, for the amount of $1,378,410.

**COUNT II. VIOLATION OF RIGHTS UNDER 1992 INVESTMENT TREATY AND INTERNATIONAL PRIVATE LAW (EXPROPRIATION WITHOUT COMPENSATION)**

61. Plaintiff incorporates by reference the allegations in Paragraphs 1-50 above, as if pled herewith again with full force and effect.

62. Under Article III of the 1992 Treaty cited above, "1. Investments shall not be expropriated or nationalized either directly or indirectly through measures tantamount to expropriation or nationalization ("expropriation") except…upon payment of prompt, adequate and effective compensation... Compensation shall be equivalent to the fair market value of the expropriated investment immediately before the expropriatory action…be paid without delay; include interest at a commercially reasonable rate from the date of expropriation; be fully realizable; and be freely transferable."

63. Akimat has acted in disregard of its obligations under the Treaty not to expropriate American investments, at least without just compensation based on a fair market valuation of the investments already made.

64. For example, by its actions Akimat disregarded the provisions in the 1992 Treaty that investments incorporate, under Article I, "(e) "associated activities" [which] include the organization, control, operation, maintenance and disposition of companies, branches, agencies, offices, factories or other facilities for the conduct of business; the making, performance and enforcement of contracts; the acquisition, use, protection and

disposition of property of all kinds including intellectual property rights; the borrowing of funds; the purchase, issuance, and sale of equity shares and other securities".

65. Akimat's actions were in violation of other provisions of the international law, whereas it is customary that confiscations of foreign investments must be accompanied by just compensation of foreign investments.

66. As mentioned above, Akimat's violation of the international law, including such as established by the 1992 Treaty caused the losses for HRF in the amount of $1,378,410, which represents a fair market value of the lost investments.

67. Plaintiff is entitled to the compensation of all the investments made, based on fair market values, as previewed by Article III of said Treaty, which rises to the level of the USA's protection under Article V that it, as a "Party [to the Treaty] may protect the rights of creditors, or ensure the satisfaction of judgments in adjudicatory proceedings, through the equitable, nondiscriminatory and good faith application of its law."

**COUNT III. UNJUST ENRICHMENT**

68. Plaintiff incorporates by reference the allegations in Paragraphs 1-50, as if pled herewith again with full force and effect.

69. As a result of the confiscations on two separate occasions, Akimat has retained all the benefits of the investments as already made into two plots of land in Atyrau, through HRF and other American investors.

70. Ultimately, those benefits were for the true benefit of Akimat's functionaries and their privies in the private businesses, which were the driving force for the confiscation.

71. As mentioned above, HRF evaluates the value of the confiscated assets to be $1,378,410 at the present time. Respectively, this estimate corresponds to the unjust enrichment for Akimat.

72. By violating, inter alia, the Treaty's Article III provision prohibiting expropriations without fair compensation and under other applicable law, Akimat is liable for unjust enrichment.

73. Plaintiff is entitled to the compensation and to damages for Akimat's unjust enrichment.

**COUNT IV. DECLARATORY RELIEF**

74. Plaintiff incorporates by reference the allegations in Paragraphs 1-50 above, as if pled herewith again with full force and effect.

75. HRF seeks a declaration that the confiscation of the assets, financed through American investments, was unlawful and contrary to Kazakhstan's obligations under the 1992 Treaty between the USA and Kazakhstan.

76. Even though Plaintiff has not utilized arbitration proceeding for these claims, HRF is entitled to the declaration that Akimat acted in the contravention of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which Kazakhstan, in force for Kazakhstan since October 21, 2000.

77. To the extent Akimat opts to seek protection under the FSIA as an 'organ' or instrumentality of a sovereign country, HRF should be entitled to a declaratory relief that Kazakhstan should be declared responsible for the liabilities of Akimat in the event Akimat refuses to satisfy a judgment in this case.

78. Therefore, HRF is entitled to a declaratory relief as indicated above, on all the claims for relief.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff HRF requests this honorable Court to grant relief as follows:

1) An Order to refund and repay all investments made for the assets in Kazakhstan, including the fair market value of the monies, goods and services provided, for the amount $1,378,410;
2) To award further damages based on an equitable relief of unjust enrichment of Defendant Akimat at the expense of American investments;
3) In the event Akimat is adjudged as an "organ" of a foreign sovereign State, a declaration that such damages based on a commercial fraud and/or confiscation previewed by the 'Commercial Exception' and/or the 'Expropriation Exception' of FSIA, allow HRF to seek damages also from Kazakhstan as a guarantor for its organs and instrumentalities;
4) Declaratory relief adjudging Akimat to have violated the 1992 Treaty of the United States with Kazakhstan, prohibiting confiscation of investments without just compensation;
5) A further award of all anticipated profits, beyond the direct damages, arising from the investment projects in Kazakhstan, described above, the exact amount to be proven through expert witnesses at trial;
6) Such other and further relief as the Court finds proper, just and fair;
7) Attorneys' fees and costs.

//

//

Respectfully submitted:

Dated: May 29, 2017

/s/ (*George Lambert*)

GEORGE LAMBERT (D.C. Bar No. 979327)
LAW OFFICES LAMBERT & ASSOCIATES
1025 Connecticut Avenue, #1000, NW
Washington, D.C., 20036
Tel. (202) 640 1897, Fax (800) 852 1950
E-mail: lawdc10@gmail.com
Attorneys for Plaintiff HRF Trade Inc.

# EXHIBIT A

*Translation.*

**ORDINANCE**
**Of AKIMAT OF THE CITY OF ATYRAU**

CITY OF ATYRAU, No. 274 February 17, 2017

**ON COMMENCEMENT OF COMPULSARY CONFISCATION OF REALTY FOR STATE USE FROM KAZENERCOM LLC**

In accordance with Article 242 of the Civil Code of the Republic of Kazakhstan, being guided by Articles 16, 85, 75 of the Land Code of the Republic of Kazakhstan dated June 20, 2003 No. 442-II, Article 57 of the Act of the Republic of Kazakhstan "On Local State Governance and Self-Governance in the Republic of Kazakhstan', and Article 63 of the Act of the Republic of Kazakhstan "On State Property", as well as based on the minutes of the conclusions of the commission upon consideration of individuals and legal persons on allocation of land plots on January 10, 2017 No. 1, Akimat of the City of Atyrau hereby ESTABLISHES:

1. In connection with the confiscation for State needs of the land plot, with the purpose of creating engineering communications for the residential area Zarosly, to commence the compulsory confiscation of the land plot owned by Kazenercom LLC, situated at the address: City of Atyrau, District Atyrau Village, with the area of 20.0 hectares, under the designation of the plot ID No. 04-066-046-1158, with the purpose designation for the use of gardening.

2. The date of the compulsory confiscation of the gardening plots shall be June 15, 2017.

3. The owners of the Land for conducting negotiations shall be directed at the following address: 77-A Aiteke-be Street, Building of the City Akimat, 3rd Floor, Room 310, City of Atyrau.

4. The State entity Department of Land Relationships of the City of Atyrau shall publish the present Ordinance in the local mass media within three working days after the adoption of the present Ordinance.

Head of Akimat of the City S. Shapkenov

---

CERTIFICATION OF TRANSLATION

I, Tatiana Isayeva, certify herewith that I am competent to translate from Russian into English, by way of my education as an instructor of languages and my experience of work as the instructor in languages at the university education level and as the translator, and that the foregoing translation is correct in all respects.

Dated: May 27, 2017

## ПОСТАНОВЛЕНИЕ
### акима города Атырау

**город Атырау №274 17 февраля 2017 года**

**О начале принудительного отчуждения земельного участка для государственных нужд ТОО «Kazenercom»**

Согласно статье 242 Гражданского Кодекса Республики Казахстан, руководствуясь статьями 18,84,85 Земельного Кодекса Республики Казахстан от 20 июня 2003 года №442-II, статьей 37 Закона Республики Казахстан «О местном государственном управлении и самоуправлении в Республике Казахстан» и статьей 63 Закона Республики Казахстан «О государственном имуществе», а также на основании протокольного заключения комиссии по рассмотрению обращений физических и юридических лиц о выделении земельных участков от 10 января 2017 года №1, акимат города ПОСТАНОВЛЯЕТ:

1.В связи с изъятием для государственных нужд земельного участка, с целью проведения инженерных коммуникаций для жилого массива Заросльй, начать принудительное отчуждение земельного участка ТОО «Kazenercom», расположенного по адресу: город Атырау, в районе Атырауского сельского округа площадью 20,0 га, с кадастровым номером №04-066-046-1158, с целевым назначением для садоводства.

2.Датой принудительного отчуждения земельных участков определить 15 июня 2017 года.

3.Собственнику земельного участка для осуществления переговоров необходимо обратиться по адресу: город Атырау, улица Айтеке би, 77-А, здание городского акимата, 3 этаж, кабинет 310.

4.Государственному учереждению «Отдел земельных отношений города Атырау» опубликовать указанное постановление в местных средствах массовой информации в течение трех рабочих дней с даты принятия.

**Аким города С. ШАПКЕНОВ**